UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

LEROY VANOVER,                          )
                                        )
            Plaintiff,                  )
                                        )
                                        )
v.                                      )        No. 3:14-CV-301
                                        )        (PHILLIPS/SHIRLEY)
CAROLYN W. COLVIN,                      )
Acting Commissioner of Social Security, )
                                        )
            Defendant.                  )

## REPORT AND RECOMMENDATION

This case is before the undersigned pursuant to 28 U.S.C. § 636(b), Rule 72(b) of the

Federal Rules of Civil Procedure, and the Rules of this Court for a report and recommendation

regarding disposition by the District Court of Plaintiff's Motion for Summary Judgment and

Memorandum in Support.  [Doc. 15 & 16].  Also before the Court is Defendant's Motion for

Summary Judgment and Memorandum in Support [Docs. 19 & 20].  Plaintiff Leroy Vanover

seeks judicial review of the decision of the Administrative Law Judge ("ALJ"), the final decision

of the Defendant Carolyn W. Colvin, Acting Commissioner of Social Security ("the

Commissioner").

On October 14, 2009, Plaintiff protectively filed an application for disability insurance

benefits ("DIB") and supplemental security income ("SSI") with an alleged onset date of May

24, 2008.  [Tr. 196-206, 231-32].  The Social Security Administration denied Plaintiff's

application initially and upon reconsideration.  [Tr. 97-100, 102-05].  Plaintiff originally

appeared before Administrative Law Judge William P. Newkirk on January 19, 2011 in

Knoxville, Tennessee.  [Tr. 36].  The ALJ issued an unfavorable decision on February 3, 2011,

[Tr. 79-83], and the Appeals Council remanded the case for additional review on June 28, 2012.

[Tr. 94-96]. Plaintiff appeared for another hearing before Administrative Law Judge James

Dixon on December 11, 2012 in Knoxville, Tennessee. [Tr. 51]. The ALJ issued an unfavorable

decision on February 26, 2013. [Tr. 14-30]. Plaintiff filed his appeal of the decision, which the

Appeals Council declined to review on May 5, 2014. [Tr. 10-13, 1-4].

Having exhausted his administrative remedies, Plaintiff filed a Complaint with this Court

on July 1, 2014, seeking judicial review of the Commissioner's final decision under Section

205(g) of the Social Security Act. [Doc. 2]. The parties have filed competing dispositive

motions, and this matter is now ripe for adjudication.

## I.     ALJ FINDINGS

The ALJ made the following findings:

> 1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2009.

> 2. The claimant has not engaged in substantial gainful activity since May 24, 2008, the alleged onset date (20 CFR 404.1571 *et seq.* and 416.971 *et seq.*).

> 3. The claimant has the following severe impairments: intellectual deficits, learning disorder and depression (20 CFR 404.1520(c) and 416.920(c)).

> 4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).

> 5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: he is able to perform simple, routine, repetitive tasks, concentrate, persist and maintain pace for two-hour periods throughout the workday, interact appropriately in

2

the workplace, adapt to infrequent changes in work routine, set short-term goals and cannot perform work requiring literacy skills.

6. The claimant is capable of performing past relevant work as a maintenance/trash collector/clean up worker. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7. The claimant has not been under a disability, as defined in the Social Security Act, from May 24, 2008, through the date of this decision. (20 CFR 404.1520(f) and 416.920(f)).

[Tr. 19-26].

## II.   DISABILITY ELIGIBILITY

This case involves an application for DIB and SSI benefits. An individual qualifies for DIB if he or she: (1) is insured for DIB; (2) has not reached the age of retirement; (3) has filed an application for DIB; and (4) is disabled. 42 U.S.C. § 423(a)(1). To qualify for SSI benefits, an individual must file an application and be an "eligible individual" as defined in the Act. 42 U.S.C. § 1382(a); 20 C.F.R. § 416.202. An individual is eligible for SSI benefits on the basis of financial need and either age, blindness, or disability. See 42 U.S.C. § 1382(a).

"Disability" is the inability "[t]o engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A).

An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied

3

for work.

42 U.S.C. § 1382c(a)(3)(B).

Disability is evaluated pursuant to a five-step analysis summarized as follows:

> 1. If claimant is doing substantial gainful activity, he is not disabled.
>
> 2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.
>
> 3. If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.
>
> 4. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.
>
> 5. Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity ("RFC") and vocational factors (age, education, skills, etc.), he is not disabled.

Walters v. Comm'r of Soc. Sec., 127 F.3d 525, 529 (6th Cir. 1997) (citing 20 C.F.R. § 404.1520). Plaintiff bears the burden of proof at the first four steps. Walters, 127 F.3d at 529. The burden shifts to the Commissioner at step five. Id. At the fifth step, the Commissioner must prove that there is work available in the national economy that the claimant could perform. Her v. Comm'r of Soc. Sec., 203 F.3d 388, 391 (6th Cir. 1999) (citing Bowen v. Yuckert, 482 U.S. 137, 146 (1987)).

## III. STANDARD OF REVIEW

When reviewing the Commissioner's determination of whether an individual is disabled pursuant to 42 U.S.C. § 405(g), the Court is limited to determining "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial

4

evidence." Blakley v. Comm'r of Soc. Sec., 581 F.3d 399, 405 (6th Cir. 2009) (citing Key v. Callahan, 109 F.3d 270, 273 (6th Cir. 1997)). If the ALJ applied the correct legal standards and his findings are supported by substantial evidence in the record, his decision is conclusive and must be affirmed. Warner v. Comm'r of Soc. Sec., 375 F.3d 387, 390 (6th Cir. 2004); 42 U.S.C. § 405(g). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 241 (6th Cir. 2007) (quotation omitted); see also Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison v. NLRB, 305 U.S. 197, 229 (1938)).

It is immaterial whether the record may also possess substantial evidence to support a different conclusion from that reached by the ALJ, or whether the reviewing judge may have decided the case differently. Crisp v. Sec'y of Health & Human Servs., 790 F.2d 450, 453 n.4 (6th Cir. 1986). The substantial evidence standard is intended to create a "'zone of choice' within which the Commissioner can act, without the fear of court interference." Buxton v. Halter, 246 F.3d 762, 773 (6th Cir. 2001) (quoting Mullen v. Bowen, 800 F.2d 535, 545 (6th Cir. 1986)). Therefore, the Court will not "try the case de novo, nor resolve conflicts in evidence, nor decide questions of credibility." Garner v. Heckler, 745 F.2d 383, 387 (6th Cir. 1984).

In addition to reviewing the ALJ's findings to determine whether they were supported by substantial evidence, the Court also reviews the ALJ's decision to determine whether it was reached through application of the correct legal standards and in accordance with the procedure mandated by the regulations and rulings promulgated by the Commissioner. See Wilson v. Comm'r of Soc. Sec., 378 F.3d 541, 544 (6th Cir. 2004). The Court may, however, decline to reverse and remand the Commissioner's determination if it finds that the ALJ's procedural errors

5

were harmless.

An ALJ's violation of the Social Security Administration's procedural rules is harmless and will not result in reversible error "absent a showing that the claimant has been prejudiced on the merits or deprived of substantial rights because of the [ALJ]'s procedural lapses." Wilson, 378 F.3d at 546-47. Thus, an ALJ's procedural error is harmless if his ultimate decision was supported by substantial evidence *and* the error did not deprive the claimant of an important benefit or safeguard. See Id. at 547.

On review, Plaintiff bears the burden of proving his entitlement to benefits. Boyes v. Sec'y. of Health & Human Servs., 46 F.3d 510, 512 (6th Cir. 1994) (citing Halsey v. Richardson, 441 F.2d 1230 (6th Cir. 1971)).

## IV. EVIDENCE

On October 14, 2009, Plaintiff protectively filed an application for DIB and SSI with an alleged onset date of May 24, 2008. [Tr. 196-206, 231-32]. Plaintiff was born on January 23, 1979 and graduated from high school with a special education diploma. [Tr. 231, 240]. Plaintiff reported past relevant work as a maintenance worker and laborer. [Tr. 237]. He alleged that he ceased working on May 24, 2008 because he was laid off from his job. [Tr. 236]. Plaintiff alleges disability based on illiteracy and a learning disability. [Id.].

### A. Educational Records and Medical Evidence[1]

Plaintiff was enrolled in special education classes throughout his educational career. [Tr. 312]. On May 21, 1990, school psychologist, Sandra Burnett, conducted a psychological evaluation of Plaintiff. [Tr. 441-44]. Plaintiff was eleven years old at the time. She

---

[1] Because the issues raised by Plaintiff concern his allegations of mental impairments and intellectual functioning, the Court will only focus on the facts and evidence concerning his mental and intellectual impairments.

administered an IQ test, and Plaintiff had a verbal IQ of 67, performance IQ of 74, and a full scale IQ score of 69. [Tr. 441]. Another psychological evaluation was conducted on December 9, 1992. [Tr. 401-05]. Dr. Penny Pendleton noted that Plaintiff had a full scale IQ score of 81 in 1987 and 69 in 1990. [Tr. 403]. Dr. Pendleton found that Plaintiff's "strengths across adaptive domains appear to be self-help skills and social adaptation" but his "[a]cademics are very weak." [Tr. 404-05]. In January of 1996, Knox Country records noted that Plaintiff's most recent IQ testing revealed a full scale IQ score of 69, [Tr. 317], and in April of 1996, the Knox County School System found that Plaintiff met the criteria for mental retardation. [Tr. 316].

In 1996, Plaintiff was referred to the vocational rehabilitation employment program. [Tr. 359]. Plaintiff received training through the Knox County Association for Retarded Citizens ("KCARC") and in March 1997, Plaintiff's "[i]nitial week was impressive. He listened to instructions and followed them well. Stayed on task." [Tr. 357]. In April 1997, Plaintiff's progress reported stated that he was present eleven days and absent for ten days, only two of which were excusable. [Tr. 356]. It was noted that Plaintiff was "absent at least 2 days or more each of the 6 weeks that he has been with the program. He works very slowly but quality is good. Fails to follow safety procedures. Tires easily. Does not move from one assignment to the next without further instructions." [Id.]. In May 1997, Plaintiff missed eight out of twenty one days. [Tr. 355].

Dr. Kathryn Smith conducted a psychological examination on December 10, 2009. [Tr. 325]. She reported that Plaintiff "drove to the evaluation accompanied by his girlfriend. They arrived early. He was appropriate in appearance . . . He was pleasant and cooperative[.]" [Id.]. Dr. Smith noted that she was not given any records for her review and that Plaintiff "says he does not have any physical or medical problems. The allegation of disability has to do with his

7

inability to read and write and problems with depression. He said he has been depressed since May of 2009 which was when his daughter had to go into foster care[.]" [Id.]. The Plaintiff stated that his daughter was in foster care because her mother failed to send her to school. [Id.]. Plaintiff reported daily activities of driving, cooking, sweeping, mopping, vacuuming, dusting, laundry, caring for pets, taking out the garbage, mowing the lawn, caring for children, paying bills, and doing "the shopping with his girlfriend." [Tr. 327]. He stated that his hobbies consisted of playing video games. [Id.]. Plaintiff stated that a good day was when he was able to have a visitation with his daughter and on a bad day he "just wants to sit by himself and be alone because he is very depressed." [Id.]. Dr. Smith noted that the "difference between current and premorbid functioning is that premorbidly he was able to work a job." [Id.].

Dr. Smith conducted a Wechsler Adult Intelligence Test and Wide Range Achievement Test. [Id.]. Plaintiff had a full scale IQ score of sixty-five with "verbal comprehension in the extremely low range, perceptual reasoning in the low average range, working memory in the extremely low range, processing speed in the borderline range and a full scale IQ score in the extremely low range." [Tr. 328]. Dr. Smith found that Plaintiff "is at a very low level in reading and math. He is to be considered functionally illiterate." [Id.]. Dr. Smith diagnosed Plaintiff with depressive disorder, borderline intellectual functioning, "[o]ccupational problems and problems with primary support group[,]" and a Global Assessment of Functioning ("GAF") of 55. [Tr. 329]. Dr. Smith concluded:

> Mr. Vanover could understand, remember and carry out simple
> instructions with no real limitations as long as there is no reading
> at all. He does not have the intellectual ability to do detailed or
> complex instructions. Ability to sustain concentration and persist
> on the job is moderately to severely restricted. Ability to interact
> with others is appropriately mildly limited. Ability to adapt to
> changes in requirements is moderately limited.

8

[Tr. 329].

Dr. Victor O'Bryan submitted a psychiatric RFC assessment on January 5, 2010. [Tr. 331-48]. He found that Plaintiff could perform one to two step tasks, interact appropriately in the workplace, adapt to infrequent changes, set short term goals, and maintain concentration, persistence, and pace ("CPP") for two hour periods during a normal workday. [Tr. 333]. Dr. O'Bryan diagnosed Plaintiff with borderline intellectual functioning and depression. [Tr. 336-38]. He found that Plaintiff was mildly limited in activities of daily living and social functioning, moderately limited in CPP, and had no episodes of decompensation. [Tr. 345]. Dr. O'Bryan noted that Plaintiff "functioned well in his previous employment" and that he should be "capable of at least simple work, perhaps more if task can be learned without written instruction." [Tr. 347].

Plaintiff sought treatment at Helen Ross McNabb Center ("HRMC") for depression from July 2010 through September 2012. [Tr. 460-95, 514-614]. During his initial appointment, Plaintiff reported that he had been depressed "ever since my dad passed away in 2006. It just made it worse when they took my daughter away." [Tr. 485]. Plaintiff was provisionally diagnosed with depressive disorder. [Tr. 487]. A psychiatric assessment was conducted on July 20, 2010. [Tr. 475]. Plaintiff's psychosocial stressors included losing his maintenance job at Neyland Stadium, the death of his father, and his daughter's placement into the Department of Children Service's ("DCS") custody. [Id.]. It was noted that Plaintiff lost his job due to budget cuts. [Id.]. He was diagnosed with depressive disorder and a GAF of 50. [Tr. 476]. In September 2012, Plaintiff was on time to his appointment and described his ongoing attempts to reinstate custody of his daughter. [Tr. 514-15].

9

Dr. James Murray conducted a psychological evaluation in February 2012 based on a referral from Knox County DCS in order to "assess the psychological functioning of Mr. Vanover to assist DCS and the Juvenile Court in decisions regarding Mr. Vanover's future role in parenting his daughter." [Tr. 506]. Dr. Murray reviewed DCS records indicating that Plaintiff's daughter was placed in protective custody after reports of sexual abuse by family members and neighbors and Plaintiff "had been insufficiently attentive and proactively protective in this situation." [Tr. 507]. DCS reports further noted concern with Plaintiff's "difficulty maintaining a repaired and well kempt home. There are more general concerns about his functioning given his intellectual and social limitations. However, records also note he made reasonable efforts to improve the safety and general condition of his home." [Tr. 508]. Dr. Murray concluded that Plaintiff's "history, his overt behavior in the evaluation, and psychological testing in the past and the present, indicate that Mr. Vanover's cognitive functioning is substantially impaired." [Tr. 512]. Dr. Murray found that Plaintiff's thinking is "simplistic, concrete, and socially unsophisticated. In addition, he has significant psychological problems with anxiety, depression, and episodically poor control of anger . . . These psychological factors are highly likely to negatively impact his functioning across a large number of important areas requiring responsible behavior, including parenting." [Id.].

### B.    Other Evidence

DCS filed a Petition to Terminate Parental Rights against Plaintiff on May 1, 2012. [Tr. 292]. DCS sought to terminate Plaintiff's parental rights of his minor daughter, arguing that Plaintiff was unable to "adequately provide for the further care and supervision of the child because Respondent's mental condition is presently so impaired and is so likely to remain impaired that it is unlikely that [he] will be able to assume the care of and responsibility for the

10

child in the near future[.]" [Tr. 294].

The ALJ issued an unfavorable decision on February 26, 2013. [Tr. 14-30]. The ALJ found that Plaintiff's mental impairments did not satisfy Listing 12.05. [Tr. 20]. The ALJ assessed that Plaintiff was mildly impaired in his daily activities and social functioning and moderately impaired in regard to CPP. [Tr. 21]. The ALJ determined that Listing 12.05C was inapplicable because "the claimant's adaptive functioning exceeds the scores achieved during intellectual testing. Further, the claimant's mood problems do not impose additional and significant work-related limitations and appear to be situational in nature[.]" [Tr. 22]. In weighing the medical evidence, the ALJ gave Dr. O'Bryan's opinion significant weight, Dr. Smith's opinion some weight, and Dr. Murray's opinion "little weight since it does not evaluate or purport to assess his functional capacity." [Tr. 24]. The ALJ noted that Dr. Murray's opinion was derived for the purpose of determining Plaintiff's ability to parent his daughter and "[i]ts relevance to the issues in this claim is dubious." [Id.].

## V.     POSITIONS OF THE PARTIES

Plaintiff argues that the ALJ erred in finding his mental impairments and intellectual deficits did not satisfy Listing 12.05C. Plaintiff contends that the ALJ did not adequately consider the medical evidence in making his determination that none of Plaintiff's impairments satisfied the Listings. The Commissioner responds that the ALJ's decision that Plaintiff's intellectual functioning failed to meet the criteria of Listing 12.05C was supported by substantial evidence and that the ALJ properly considered the medical evidence in formulating his decision.

## VI.     ANALYSIS

The Court will address each of the issues presented in turn.

### A.  Listing 12.05C

The Court finds that the ALJ's determination that Plaintiff's mental impairments do not satisfy Listing 12.05 is based on substantial evidence. Generally, a claimant can establish disability by demonstrating all of the medical findings listed for an impairment. 20 C.F.R. § 404.1525(c)(3). "If a claimant does not have one of the findings, however, [he or] she can present evidence of some medical equivalent to that finding." Bailey v. Comm. Soc. Sec., 413 F. App'x 853, 854 (6th Cir. Mar. 11, 2011) (citing C.F.R. §§ 404.1525 & 404.1526). To demonstrate such a medical equivalent, the claimant must present "medical findings equal in severity to *all* the criteria for the one most similar listed impairment." Sullivan v. Zebley, 493 U.S. 521, 531 (1990) (emphasis in original). The claimant has the burden of establishing that his impairment meets or equals a listed impairment. Walters, 127 F.3d at 529.

Once a plaintiff proves the existence of a severe impairment, the impairment must be analyzed under the Listings set forth in 20 C.F.R. § 404, Subpart P, Appendix 1. See Reynolds v. Comm'r of Soc. Sec., 424 F. App'x 411, 415 (6th Cir. 2011) (finding that "[a]n administrative law judge must compare the medical evidence with the requirements for listed impairments in considering whether the condition is equivalent in severity to the medical findings for any Listed Impairment."). In Reynolds, the court found that the ALJ erred by failing to analyze the Plaintiff's physical impairments because the ALJ "skipped an entire step of the necessary analysis. He was required to assess whether [Plaintiff] met or equaled a Listed Impairment . . . but did not do so." Id.

In relevant part, Listing 12.05 provides the following:

> 12.05 Intellectual disability: Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the

12

developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

. . . .

C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work related limitation of function[.]

20 C.F.R. § 404, Subpart P, App. 1.

Thus, to meet or equal Listing 12.05, a claimant's impairment must satisfy "the diagnostic description in the introductory paragraph *and* any one of the four sets of criteria." Id. (12.00A) (emphasis added). In order to satisfy the diagnostic description, "a claimant must demonstrate three factors: (1) subaverage intellectual functioning; (2) onset before age twenty-two; and (3) adaptive-skills limitations. Hayes v. Comm'r of Soc. Sec., 357 F. App'x 672, 675 (6th Cir. 2009). "Adaptive functioning includes a claimant's effectiveness in areas such as social skills, communication, and daily living skills." West v. Com'r Soc. Sec. Admin., 240 F. App'x 692, 698 (6th Cir. 2007) (citing Heller v. Doe by Doe, 509 U.S. 312, 329 (1993)).

The Court will address the diagnostic description of 12.05 and the criteria of 12.05C in turn.

*(1) 12.05 Diagnostic Description*

Plaintiff contends that the ALJ erred in finding he did not meet the diagnostic description of Listing 12.05. The Court disagrees.

The ALJ assessed that Plaintiff was mildly impaired in his daily activities and social functioning and moderately impaired in regard to CPP. [Tr. 21]. The ALJ explained that Plaintiff's ability to care for "children and pets, his engagement in household chores and home

13

repair projects, his ability to manage money independently and his hobbies indicate that his IQ scores . . . belie his adaptive capabilities in [CPP]. Based on his functioning, it appears that he experiences moderate difficulties in this area of functioning." [Id.].

The Plaintiff contends that the ALJ failed to address his adaptive functionality prior to the age of twenty-two. [See Doc. 16 at 13]. However, the ALJ explicitly considered Plaintiff's IQ scores during his developmental period and found that "the claimant's adaptive functioning exceeds the scores achieved during intellectual testing." [Tr. 22].[2] The Court concurs with Plaintiff that his school records reflect subaverage intellectual functioning prior to the age of twenty two. [See Tr. 316-17] (Plaintiff's full scale IQ score was reported as 69 in 1996, and the Knox County School System found that Plaintiff met the criteria for mental retardation). However, the question of adaptive functioning includes, but is not *limited* to, a claimant's developmental period. The Sixth Circuit has found time and again that regardless of Plaintiff's abilities during childhood, a lack of adaptive limitations during adulthood prevents satisfaction of the 12.05 diagnostic description. See Hayes, 357 F. App'x at 677 (finding that plaintiff's adaptive skills were not deficient based on her daily activities and ability to care for herself, her

---

[2] The Court notes that there is discrepancy in the record regarding Plaintiff's IQ scores. Plaintiff contends that his score of 81 is invalid to show deficiency prior to age twenty-two because scores prior to the age of 16 are only valid for 2 years. [See Doc. 16 at 15]. The ALJ declined to address this discrepancy. [Doc. 22]. The Court finds that any disagreement about the applicability of these scores is moot because the Court has determined that the ALJ's decision that the Plaintiff did not meet the diagnostic description of 12.05 was based on substantial evidence regardless of his IQ scores. However, the Court wishes to clarify that Plaintiff's interpretation of the validity of these scores is incorrect. Any valid IQ score obtained prior to the age of twenty-two can serve as evidence of intellectual impairment during the developmental period. See Dragon v. Comm'r of Soc. Sec., 470 F. App'x 454, 461 (6th Cir. 2012) (explaining that "[d]isregarding the scores [based on the fact that the plaintiff was fourteen years of age] misconstrues the relevance of the scores; indeed, an older score was relevant to establish the manifestation of Dragon's impairment before the age of 22"). The court in Dragon noted the plaintiff's argument that "I.Q. tests obtained before the age of 16 are not necessarily reliable" but clarified that "[t]he provision cited [by plaintiff] deals specifically with mental retardation under Listing 12.05, regarding mental disorders for children under age 18 . . . Dragon's claim has been made under Listing 12.05, not under Listing 112.05." 470 F. App'x at 461, n.2. The Court relies on this reasoning and finds the Plaintiff's argument in this regard is without merit.

husband, their finances, and their home); West, 240 F. App'x at 698 (finding no adaptive functioning limitations based on Plaintiff's work history and daily activities and affirming "the ALJ's decision because West introduced absolutely no evidence that he experienced deficiencies at all in 'adaptive functioning,' let alone that any such deficiencies arose during the developmental period.") (citing Foster v. Halter, 279 F.3d 348, 355 (6th Cir. 2001) & Carmack v. Barnhart, 147 F. App'x 557, 560-61 (6th Cir. 2005)).

This case is similar to those cited above. The record reflects a wide range of daily activities employed by Plaintiff to care not only for himself, but for his children, long-time girlfriend, and household. [See Tr. 327]. Further, Plaintiff was successfully employed prior to his alleged onset date, evidencing his ability to function in the workplace and interact with peers and supervisors. [See Tr. 236-37]. The only reason Plaintiff lost his job in 2008 was due to budget cuts and there is nothing in the record reflecting any deficiency in Plaintiff's performance. [See id.; 475]. This case is similar to West, in which the Sixth Circuit considered the plaintiff's "long-term, full-time position with the City of Wilmore, demonstrating his ability to interact socially on a daily basis." 240 F. App'x at 698. In that case, the court found the plaintiff's ability "to care for his daily needs, to pay bills, to shop for groceries, to interact with friends and families, and to engage in numerous other daily activities" to belie any deficiency in adaptive functioning. Id. The Court finds the same here. Plaintiff testified that he held three different positions prior to 2008, all for significant amounts of time, without any evidence of termination or disciplinary procedures based on Plaintiff's inability to function properly in the workplace or carry out his responsibilities. [See Tr. 40-41] (Plaintiff testifying that he worked in the maintenance department at Neyland Stadium for "going on three years" before being laid off based on a budget cuts, and that prior to that position he worked at a restaurant as a dishwasher

15

for two years and at Dollywood for one year).

The Court notes that Plaintiff is correct in citing various portions of the record to show a history of extremely low intellectual functioning. [See Tr. 316] (Knox County School records finding Plaintiff was mentally retarded); [Tr. 327] (Dr. Smith noting Plaintiff's extremely low IQ); [Tr. 512] (Dr. Murray finding Plaintiff's "cognitive functioning is substantially impaired."). However, as explained above, there is a wealth of evidence showing that Plaintiff is capable of not only performing a wide range of daily activities and caring for himself and his family, but that he is fully capable of maintaining long term employment. It matters not whether the Plaintiff or this Court would have found otherwise, or whether another ALJ could have decided the case differently. Crisp, 790 F.2d at 453 n.4. The only question here is whether the ALJ adhered to agency procedure and formulated a decision supported by substantial evidence. The Court finds in the affirmative in both regards.

The ALJ found no deficiencies in Plaintiff's adaptive functioning based on his work history and extensive daily activities. By finding that Plaintiff was not markedly limited in adaptive functioning, the ALJ adequately addressed the diagnostic description. The Court finds that substantial evidence supports the ALJ's determination that the Plaintiff did not meet the diagnostic description of Listing 12.05.

*(2) Criteria to Meet 12.05C*

The Plaintiff argues that the ALJ erred in his consideration of his IQ scores and medical evidence in finding that he did not satisfy the criteria of 12.05C. The Court concurs that the Plaintiff satisfied the criteria of 12.05C. He received a valid IQ score of 65 in 2009. [Tr. 328]. Further, the ALJ found that his depression was a severe impairment. [See Tr. 20]; see also 20 C.F.R. § Pt. 404, Subpt. P, App. 1 ("For paragraph C, we will assess the degree of functional

16

limitation the additional impairment(s) imposes to determine if it significantly limits your physical or mental ability to do basic work activities, i.e., is a 'severe' impairment(s), as defined in §§ 404.1520(c) and 416.920(c)); Breitenstein v. Astrue, No. 3:10CV00032, 2011 WL 1235018, at *13 (S.D. Ohio Jan. 6, 2011) (internal citations omitted) (by determining "at Step 2 that Plaintiff's stuttering, depression, and anxiety were 'severe' impairments under 20 C.F.R. 416.920(c), [the ALJ] had effectively determined that these impairments imposed 'additional and significant work-related limitation of function' in satisfaction of Listing 12.05C.").

However, any argument in regards to the specific criteria of 12.05C is moot because the Court has already found that substantial evidence supports the ALJ's determination that the Plaintiff did not meet the diagnostic description of Listing 12.05. The Court finds that the ALJ's determination at step three is based on substantial evidence because Plaintiff's mental and intellectual impairments failed to satisfy the diagnostic description of Listing 12.05.

**B. Consideration of the Medical Evidence**

The Plaintiff claims that the ALJ erred in his consideration of the medical evidence in finding that Plaintiff's depression did not cause "significant work related limitation of function[.]" 20 C.F.R. § 404, Subpart P, App. 1. This argument is moot for the reasons explained above. However, the Court considered the ALJ's consideration of the medical evidence in regards to formulating his RFC and finds no error in this regard.

Under the Social Security Act and its implementing regulations, an ALJ will consider all the medical opinions in conjunction with any other relevant evidence received in order to determine if a claimant is disabled. 20 C.F.R. § 404.1527(b). An ALJ will consider "every medical opinion" received and will give controlling weight to the opinions of treating physicians. See 20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2) ("[i]f we find that a treating source's opinion

17

on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight."). Where an opinion does not garner controlling weight, the appropriate weight to be given an opinion will be determined based upon the following factors: length of treatment, frequency of examination, nature and extent of the treatment relationship, amount of relevant evidence that supports the opinion, the opinion's consistency with the record as a whole, the specialization of the source, and other factors which tend to support or contradict the opinion. 20 C.F.R. §§ 404.1527(c)(2-6) and 416.927(c)(2-6).

In considering non-treating physician opinions, an ALJ is "not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists," but the ALJ must "consider findings of State agency medical and psychological consultants or other program physician, psychologists, and other medical specialists as opinion evidence[.]" 20 C.F.R. § 404.1527(e)(2)(i). The ALJ must evaluate the consultative physician's opinion using the relevant factors in 20 C.F.R. §§ 404.1527(c)(2-6) and 416.927(c)(2-6), the same factors used to analyze the opinion of a treating physician. See 20 C.F.R. § 404.1527(e)(2)(iii); Jericol Mining, Inc. v. Napier, 301 F.3d 703, 710 (6th Cir. 2002) ("We believe that the same factors that justify placing greater weight on the opinions of a treating physician are appropriate considerations in determining the weight to be given an examining physician's views."); Sommer v. Astrue, No. 3:10-CV-99, 2010 WL 5883653, at *6 (E.D. Tenn. Dec. 17, 2010) (citation omitted) ("The Regulations and Rulings require an ALJ, in the absence of a treating source who enjoys controlling weight, to weigh the opinions of one-time examining

physicians and record-reviewing physicians under the regulatory factors, including supportability and consistency.") (citing 20 C.F.R. § 404.1527(d) & (f)).

Here, the Court finds that the ALJ properly considered the record as a whole and applied the factors in 20 C.F.R. §§ 404.1527(c)(2-6) and 416.927(c)(2-6) in weighing the examining and non-examining physician records. The ALJ gave Dr. O'Bryan's opinion significant weight, Dr. Smith's opinion some weight, and Dr. Murray's opinion "little weight since it does not evaluate or purport to assess his functional capacity." [Tr. 24]. The ALJ noted that Dr. Murray's opinion was derived for the purpose of determining Plaintiff's ability to parent his daughter and "[i]ts relevance to the issues in this claim is dubious." [Id.]. In considering the medical evidence, the ALJ addressed many of the factors set forth in 20 C.F.R. §§ 404.1527(c)(2-6) and 416.927(c)(2-6). Specifically, the ALJ noted Drs. O'Bryan, Smith, and Murray's examining relationship, the nature and extent of their treatment relationships, the frequency of their examinations, and the supportability and consistency of their opinions. See 20 C.F.R. §§ 404.1527(c)(2-6) and 416.927(c)(2-6). In regards to Dr. O'Bryan, the ALJ noted that he "reviewed the claimant's records" and gave his opinion significant weight because it is well-supported by and consistent with the claimant's daily functioning and activities in general." [Tr. 24]. In granting Dr. Smith some weight, the ALJ considered that she examined the Plaintiff only once and juxtaposed her moderate limitations with his finding that "claimant's difficulties are moderate in nature based on his regular activities[.]" [Id.].

The Plaintiff takes specific issue with the ALJ's consideration of Dr. Murray's opinion. Yet the Court finds no error here. The ALJ considered the fact that Dr. Murray's opinion was derived for the purpose of determining Plaintiff's ability to parent his daughter. [See id.]. He explained that Dr. Murray's opinion "does not evaluate or purport to assess [Plaintiff's]

19

functional capacity . . . For the reasons discussed in detail above, the undersigned does not find that the claimant's regular activities reflect a person with extreme problems." [Id.].

The Court finds that this analysis satisfies agency procedure and that the ALJ's RFC is supported by substantial evidence. In regards to Plaintiff's intellectual impairments, the medical evidence supports the ALJ's RFC. Plaintiff reported extensive daily activities, including driving, cooking, sweeping, mopping, vacuuming, dusting, laundry, caring for pets, taking out the garbage, mowing the lawn, caring for children, paying bills, and doing "the shopping with his girlfriend." [Tr. 327]. Further, even with Plaintiff's low test scores, Dr. Smith and Dr. O'Bryan only diagnosed him with borderline intellectual functioning with no more than moderate limitations. [Tr. 329, 336-47]. The Court further relies on Dr. O'Bryan's notation that Plaintiff "functioned well in his previous employment" and that he should be "capable of at least simple work, perhaps more if task can be learned without written instruction." [Tr. 347]. The Court agrees that Plaintiff's work history contradicts a finding that he is so intellectually impaired as to prohibit future employment.

In considering Plaintiff's depression, the ALJ found that this issue "appear[s] to revolve around the situation with his daughter." [Tr. 24]. The Court concurs and finds that the medical evidence supports the ALJ's analysis. The Plaintiff argues that the ALJ did not properly consider the HRMC records. [See Doc. 16 at 17]. The Court disagrees. The ALJ cited directly to these records in finding Plaintiff's depression to be a result of situational stressors. [See Tr. 24]. The HRMC records support the ALJ's determination. Plaintiff reported that his depression was caused by his father's death and loss of his daughter. [Tr. 485]. A psychiatric assessment determined that Plaintiff's psychological stressors included losing his maintenance job at Neyland Stadium, the death of his father, and his daughter's placement into DCS custody. [Tr.

475].  Further, Drs. O'Bryan and Smith found that Plaintiff's depression caused no more than moderate limitations.  [See Tr. 329, 345].

The Court finds the Plaintiff's argument that the ALJ erred in his consideration of the medical evidence to be without merit.  In crafting Plaintiff's RFC, the ALJ considered Plaintiff's treatment records, medical opinions, daily activities, and work history.  In weighing the medical opinions, the ALJ applied many of the factors in 20 C.F.R. §§ 404.1527(c)(2-6) and 416.927(c)(2-6).  The agency requires no more and neither shall this Court.  The Court finds that the ALJ properly considered the medical evidence as a whole and that his RFC assessment is supported by substantial evidence.  Any argument to the contrary is without merit.

## VII.    CONCLUSION

Based upon the foregoing, it is hereby **RECOMMENDED**[3] that Plaintiff's Motion for Summary Judgment, **[Doc. 15],** be **DENIED,** and that the Commissioner's Motion for Summary Judgment, **[Doc. 19],** be **GRANTED**.

Respectfully submitted,

_____ s/ C. Clifford Shirley, Jr. _____
United States Magistrate Judge

---

[3] Any objections to this Report and Recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party.  Fed. R. Civ. P. 72(b)(2). Such objections must conform to the requirements of Rule 72(b), Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the District Court's order. Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466 (1985).  The district court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive or general.  Mira v. Marshall, 806 F.2d 636 (6th Cir. 1986).  Only specific objections are reserved for appellate review.  Smith v. Detroit Federation of Teachers, 829 F.2d 1370 (6th Cir. 1987).